IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 17-70001

United States Court of Appeals
Fifth Circuit

**FILED**

July 19, 2018

Lyle W. Cayce
Clerk

CHARLES MAMOU, JR.,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-403

Before OWEN, ELROD, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:*

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

In 1999, a Texas jury sentenced Charles Mamou, Jr., to death for murdering Mary Carmouche after kidnapping her. Almost two decades later, we review Mamou's claim for federal habeas relief on the following two grounds: (1) his trial counsel should have objected to victim impact testimony related to uncharged crimes; and (2) his trial counsel should have objected to or countered the testimony of an expert witness concerning magazine marks left on casings found at the crime scenes. Mamou also appeals the district court's denial of his motion for expert funding. Finding no error in the district court's rulings, we AFFIRM.

I.

Carmouche lost her life as a consequence of a bad faith drug purchase in which both sides met with the intent to rob the other. Mamou went with two other men, Samuel Johnson and Terrence Dodson, to a mall parking lot to ostensibly buy cocaine from Kevin Walter, Dion Holley, and Terrance Gibson. Mamou's plan, however, was to pretend to have the $20,000 cash in a bag, but then pull a gun on the sellers and steal the cocaine. To help with that ruse, on the way to the parking lot Mamou stopped at a convenience store to purchase a newspaper, which he then cut in dollar-sized pieces and placed in the bag. As for the sellers, they did not actually have the cocaine Mamou planned on stealing; they planned on robbing Mamou of the money they thought he had.

Each side was rightly suspicious of the other and dallied about, driving to different meeting points. In the course of this, Mamou and Johnson took Dodson home, and their three opposites picked up Carmouche. Both groups finally settled on a meeting on Lantern Point Drive, a minor street near Houston's Astrodome.

The testimony becomes confused at this point, but shots were fired. Holley was hit in the arm and ran to a nearby field. Walter attempted to

drive away in the blue Lexus in which his ensemble arrived, but Mamou shot him through the glass. While Walter was exiting the car, Mamou shot him several times more. Nonetheless, Walter continued to struggle with Mamou and ran towards the rear of the Lexus. Hit once again in the back, he stumbled to where he found a fatally wounded Gibson lying on the ground still holding his own weapon. Walter reached for the gun, but when he looked back, he saw that Mamou was escaping in the Lexus with Carmouche still in the car. Mamou later admitted at trial that he shot Gibson and Walter (in self defense, he said), but stated that he did not recollect firing at Holley.

A security guard from a nearby apartment complex and officers from the Houston Police Department arrived next. They were able to speak with Holley, who lied about the reason for their encounter with Mamou (he said his group had stopped to help Mamou whose car seemed to need a jumpstart) but accurately reported that Mamou had shot them, stolen the Lexus, and abducted Carmouche. Gibson was past help, but the police arranged for Holley and Walter to be taken to the hospital. None of these shooting victims knew what happened to Carmouche after Mamou drove away with her in the stolen car.

Two days later, a meter reader for the electric company discovered Carmouche's body in the backyard of a vacant house in southwest Houston. She had been shot once through the chest. Police found a single unspent cartridge lying near her body.

Police efforts to find Mamou led them to his father, who directed the police to Dodson, the person Mamou had dropped off before encountering the "sellers" at Lantern Point Drive. Dodson would later testify that Mamou called him after returning to his home in Louisiana the day after the shooting. When Dodson told Mamou that he had seen news reports about a stolen Lexus and missing young woman, Mamou explained that he had been

in a shootout and escaped with a girl. He said he took her to an abandoned house where she performed oral sex on him. Because the girl was "looking at him funny," Mamou shot her out of fear that she would talk to the police.

After talking to Dodson and having Holley and Walter look at photo spreads from which they identified Mamou as the shooter, the Houston Police Department detective investigating the case asked law enforcement in Louisiana to arrest Mamou. Those officials found Mamou hiding in the closet of a home in Sunset, Louisiana.

At the capital murder trial that followed, Walter, Holley, Johnson, and Dodson testified about the events of the tragic evening. The prosecution also offered firearms testimony from Robert Baldwin, a criminalist employed by the Houston Police Department. He testified that the bullet recovered from Carmouche's body shared the same "class characteristics" as the bullets that were extracted from Gibson and Holley at the hospital. He also testified that the unspent cartridge discovered near Carmouche's body was cycled through the same magazine as one of the spent cartridges found at Lantern Point.

During the punishment phase, the prosecution showed that Mamou had previously been convicted of a cocaine trafficking offense. A Louisiana police officer also testified that he once stopped Mamou for driving 100 miles per hour on the highway, discovered that he was carrying a pistol, and arrested him for being a felon in possession of a firearm.

The government also presented evidence of an uncharged murder that took place a year before Carmouche's murder. Mamou's friend Joseph Melancon testified that he had been heading with him to a nightclub when Mamou asked to stop at a convenience store. Melancon saw Mamou get out of the car and walk away with a man named "Bruiser" Williams; he then heard gunshots. Melancon testified that he later saw Williams lying on the ground at a nearby autoparts store. The police would later find newspaper

4

clippings, cut into the shape of dollar bills, scattered about the scene—the same trick of disguising newspaper as money that Mamou used at Lantern Point.

Carmouche's family offered victim impact testimony.  So did the sister of Williams and mother of Gibson even though the trial did not involve charges for their murders.  These witnesses described the emotional toll and health problems they endured in the wake of the killing of their loved ones.

Mamou sought to counter this testimony with testimony from his own family members describing his harsh upbringing and his efforts as an adult to provide for his family.  It also called two expert witnesses, psychologist Walter Quijano and parole supervisor Dorothy Morgan, who gave testimony favorable to the defense on when Mamou would be eligible for parole and the risk that he would be violent in prison.

After the jury convicted him and sentenced him to die, Mamou unsuccessfully appealed to the Texas Court of Criminal Appeals.  While his direct appeal was pending, Mamou filed a state application for habeas corpus.  This was followed by a pro se petition and a third petition filed with the assistance of new state habeas counsel.  The Court of Criminal Appeals dismissed these later petitions for abuse of the writ and adopted the findings of fact and conclusions of law of the trial court rejecting the original habeas application.  *Ex Parte Mamou*, 2014 WL 467954 (Tex. Crim. App. Feb. 5, 2014).

In federal court, Mamou sought funding to retain an expert to assist in developing his claims.  *See* 18 U.S.C. § 3599(f).  The district court denied this motion.  Mamou then filed his federal habeas petition.  It asserted 14 claims.  The district court granted summary judgment dismissing all of them, either on procedural grounds or because Mamou could not overcome AEDPA's deferential standard of review for claims the state court had rejected on the

merits.  Mamou sought a certificate of appealability from our court to appeal only on the two ineffective assistance claims we mentioned at the outset.  We authorized those appeals and now consider both claims.

## II.

Before reaching those *Strickland* claims, we review a district court decision on which Mamou did not have to obtain a certificate of appealability: the denial of his request for expert funding.  A trial court's decision to deny funding under 28 U.S.C. § 3599 is reviewed for abuse of discretion.  *See Hill v. Johnson*, 210 F.3d 481, 487 (5th Cir. 2000).  A district court may authorize funding if the services of the proposed expert or investigator are "reasonably necessary" to represent the petitioner.  18 U.S.C. § 3599(f).  While this appeal was pending, the Supreme Court rejected the "substantial need" language we had been using in applying this statute.  *Ayestas v. Davis*, 138 S. Ct. 1080 (2018).  *Ayestas* concluded that "substantial need" arguably created a greater burden than the text's "reasonably necessary" language.  *Id*. at 1093.

The district court understandably recited the then-governing "substantial need" standard in the section of its order discussing "applicable legal standard."  But it never mentioned that heightened standard again, instead using the statutory "reasonably necessary" language when declining Mamou's specific requests.  Because the reasons the district court gave for its ruling remain sound after *Ayestas*, we find no abuse of discretion.[1]

The district court rejected Mamou's request seeking funding to develop an actual innocence claim for two reasons.  First, there is no freestanding

---

[1] We recognize that in two other cases since *Ayestas* we have remanded for reconsideration of the funding decision.  *Robertson v. Davis*, No. 17-70013, 2018 WL 3309567 (5th Cir. July 5, 2018); *Sorto v. Davis*, 716 F. App'x 366 (5th Cir. March 28, 2018).  And we held off on deciding the funding decision in this case until *Ayestas* issued.  But having applied that decision to the specific reasons for the funding denial in this case, we conclude that a remand is not appropriate.  As discussed, none of the district court's reasons depend on the heightened standard that *Ayestas* rejected.

actual innocence claim on federal habeas review. *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Second, to the extent such a claim could be used to overcome a procedural default of an independent constitutional claim, Mamou was only "speculating" that the "State hid agreements with witnesses to manufacture testimony." As *Ayestas* recognized that funding is not appropriate when it "stand[s] little hope of helping him win relief," 138 S. Ct. at 1094, we find no error in the rejection of this request for funding for a claim based on nothing more than conjecture.

The district court made similar findings about insufficient detail in rejecting Mamou's request for funding of a mitigation expert, so we also find no abuse of discretion in that ruling. Nor did the district court err in concluding that there was no basis to fund an expert on future dangerousness. Mamou wanted to use that to argue there was insufficient evidence to support the jury's finding of dangerousness. But as the district court explained, a sufficiency challenge considers only "the record evidence adduced at trial." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). *Ayestas* undermines neither of these rulings. Indeed, Mamou's appeal of the funding denial does not focus on these punishment phase issues.[2]

Mamou's main challenge to the section 3599 ruling involves the funding he sought to develop ineffective assistance claims, especially his claim of ineffective habeas counsel that he was using to try and overcome the procedural default of his claim that trial counsel should have objected to magazine mark testimony from a ballistics expert.[3] The district court

---

[2] Respondent argues that we should consider the funding appeal only in the context of this *Martinez* issue. It is certainly the main target of Mamou's briefing. But we address the other funding requests out of an abundance of caution because some of Mamou's arguments may encompass them.

[3] For ineffective assistance claims that had been exhausted in state court, the district court rejected the funding request because further factual development was not

7

acknowledged that a petitioner may show cause to excuse the procedural default of ineffective assistance of trial counsel claims if he received ineffective assistance from his state habeas counsel. *See Trevino v. Thaler*, 133 S. Ct. 1911 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). But the court found that Mamou failed to "explain how state habeas counsel's representation fell below expected standards." It also held that he had failed to provide "sufficient detail" about what the basis of his underlying ineffective assistance of counsel claim would be.

*Ayestas*'s rejection of the "substantial need" standard does not undermine these findings that Mamou did not provide sufficient detail to show a reasonable need for an investigator to help find evidence of ineffective assistance. Mamou's Catch-22 argument is that he could not show cause to excuse the procedural default without funds, but the district court would not give him funds because his underlying claims were procedurally defaulted. This ignores the court's ruling that Mamou had failed to show how expert assistance would help him accomplish either goal, including establishing the ineffective assistance of habeas counsel claim that could serve as *Martinez/Trevino* cause. And for the claim Mamou pushes the most in his funding appeal and on the merits—the ineffective assistance claim related to trial counsel not challenging the magazine mark testimony—funding would not be helpful because additional information discrediting that forensic testimony would not have created a "reasonable probability" of a different result. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). That is because, as explained more fully below in discussing the merits of this claim, the magazine mark testimony that Mamou attacks was cumulative of other

---

reasonably necessary as AEDPA limits federal review to the existing state record. *See Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011); *Blue v. Thaler*, 665 F.3d 647, 655–56 (5th Cir. 2011). Mamou does not appear to challenge this ruling, which we agree with in any event.

ballistics evidence, which itself only corroborated eyewitness testimony and a confession strongly implicating Mamou. So even if court-funded investigation might have revealed further weaknesses in the ballistics testimony to show counsel's mistake in not seeking to exclude or counter it, that could not change the result of the prejudice inquiry as there remained overwhelming evidence of Mamou's guilt.[4]

We therefore conclude that the district court did not abuse its discretion in denying funding.

### III.

### A.

Mamou's first substantive claim is that his trial counsel was ineffective for failing to object to punishment phase testimony from victims of the uncharged murders. Because the state court adjudicated this claim, we can only grant relief if the state court judgment "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). For claims like Mamou's that challenge the effectiveness of counsel, that habeas standard is a second layer of deference. The first comes from the Sixth Amendment standard itself, which requires a defendant to show that his representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. In assessing counsel's actions, courts must take account of the difficult strategic choices defense lawyers have to make in the pressure cooker of trial. *Id.* at 689. Applying

---

[4] We thus need not consider respondent's alternative argument that we can affirm the funding decision as to the ineffective assistance claim on the rationale that 28 U.S.C. § 2254(e)(2) bars a federal court's consideration of new evidence when the petitioner "failed to develop the factual basis of a claim in State court proceedings" (unless certain circumstances are met). *Ayestas* "decline[d] to decide" that question, 138 S. Ct. at 1095, and we need not reach it in light of our reasoning above.

AEDPA on top of this deference to counsel's decisions already built into *Strickland*'s effectiveness inquiry means that review of this first question is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). If a petitioner can overcome these obstacles and show that counsel's performance fell below constitutional standards, he must then show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Because of AEDPA, it is not enough for a habeas petitioner to show that a state court's finding of no prejudice was wrong; the state court's decision has to be an *unreasonable* application of the second *Strickland* inquiry. *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

The district court held that "[t]he state court's denial of this claim readily withstands review." While acknowledging that Texas case law would have allowed Mamou's attorney to exclude the testimony from victims of *uncharged* offenses, *see Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997) (allowing punishment phase testimony from victims of the charged offense but not from victims of other, even related, crimes), the district court concluded that the state court's rejection of the *Strickland* claim was reasonable.

In rejecting the claim, the Texas court found neither deficient performance nor prejudice. It emphasized that the jury already knew Mamou was a drug dealer who had likely killed Gibson (the same night he abducted Carmouche) and Williams (a year earlier) even though he was not on trial for those crimes. The state court thus found reasonable the explanation of Mamou's trial counsel that allowing the victim impact testimony was a strategic choice that allowed him to call attention to Williams's and Gibson's own history of violence and drug dealing. Indeed, defense counsel in closing

argument sought to "underscore the importance throughout the entirety of [the] case about how drugs played a role in the events of the tragedy that you heard about." With respect to prejudice, the state court concluded that the brevity of this victim impact testimony, its quality, and the other aggravating evidence against Mamou meant that omission of the excludable testimony would have not affected the outcome.

Mamou challenges the state courts' characterization of the victim impact evidence. He contends that the testimony of the victims' family members was heartrending, lengthy, and was not effectively countered by trial counsel on cross examination. He also points to an instance in closing argument when the prosecutor referred the jury to the victim testimony about these other murders: "And when he pulled the gun and he fired and killed Terrance and Anthony, he ripped those families apart. . . . And every time he pulled that trigger, he answered that first special issue yes, yes, yes, yes, yes. Seven times he answered it yes."

The district court nonetheless was correct to conclude that the state court's ruling was not unreasonable. As to prejudice, even if Mamou can demonstrate that the victim impact testimony was more impactful than the state court concluded, that is not enough to render the state court's contrary view unreasonable. *See Knowles*, 556 U.S. at 123 ("[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."). But he does not make that showing. Other than the one sentence quoted above, which itself does not directly mention the testimony of the family members, the closing argument did not refer to the testimony. And we go a step further than AEDPA requires in concluding that the state court not only took a reasonable view but the better one in finding no prejudice. The murders of Gibson and Williams likely had a substantial impact at the

punishment phase. But that evidence was admissible.  The question is how much the excludable victim impact testimony about those murders added.  It may have had some marginal benefit to the prosecution in further highlighting the depravity of those uncharged murders, but not enough to create a reasonable probability that the sentence would have been different if trial counsel had objected to the testimony.

Although the lack of prejudice is enough to defeat this claim, the state court also reasonably concluded that trial counsel made a strategic choice to allow the testimony because he calculated that the marginal benefit it provided the prosecution was outweighed by emphasizing to the jury that all the violence resulted from the drug trade, with its known risks.  *See Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) ("[A] 'conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." (quoting *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009))).  Because the state court's rejection of this *Strickland* claim was not unreasonable, we must also deny habeas relief.

**B.**

Mamou's second ineffective assistance claim is that his trial counsel should have challenged certain testimony of the State's ballistics expert, Robert Baldwin.  Baldwin linked magazine marks on an unfired cartridge found at the site of Carmouche's murder with used casings discovered at the scene of the earlier Lantern Point shooting.

The district court rejected this claim on a procedural ruling that, as an example of how convoluted the procedural aspects of federal habeas law can be, had three components.  First, Mamou did not raise this claim in state court, so it is unexhausted.  28 U.S.C. § 2254(b)(1).  Second, because Texas courts would apply the abuse of the writ doctrine if Mamou now tried to

No. 17-70001

pursue the claim in a state habeas action, the district court held that the claim was procedurally defaulted. Third, Mamou could not excuse the default by establishing that his state habeas counsel was constitutionally deficient in failing to raise the claim. *See Martinez*, 566 U.S. at 14.

Mamou challenges the final step in this analysis, arguing that he can show ineffective assistance of habeas counsel that overcomes the procedural bar to his claim. Because any failure by habeas counsel to raise a claim would result in the prejudice *Strickland* requires only if "there is a reasonable probability that he would have been granted state habeas relief" had the claim been asserted, *Newbury v. Stephens*, 756 F.3d 850, 872 (5th Cir. 2014) (per curiam), the analysis of a *Strickland* claim involving habeas counsel largely merges with the merits of the underlying claim about the ineffectiveness of trial counsel. That is, Mamou must still show a reasonable likelihood of success for his *Strickland* claim about trial counsel's failure to object to the magazine mark testimony.

Mamou first tries to do so by arguing that state habeas counsel performed only a cursory investigation that was limited to reviewing the trial transcript and interviewing the jurors. The district court, however, recognized that the record belied Mamou's claim. In particular, state habeas counsel hired a ballistics expert to review the forensic evidence. The record thus does not support Mamou's contention that state habeas counsel conducted an inadequate investigation of the ballistics evidence offered at trial.

Apart from any deficiencies in counsel's investigation of the ballistics, Mamou contends that state habeas counsel rendered ineffective assistance because the flaws in Baldwin's testimony should have been obvious. From today's vantage point, Mamou is able to point out errors in Baldwin's testimony. Most glaringly, it was based on the "individuation fallacy"—in

layman's terms, this is the incorrect assumption that no two magazines will produce the same markings on cartridges cycled through them. Critics of magazine mark testimony argue it is not backed by statistics demonstrating the rate of false positives and false negatives or any other proof that a given magazine imprints a unique mark when used. *See* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 COLUM. SCI. & TECH. L. REV. 2 (2005).

Yet the district court rejected these authorities as a basis for finding that Mamou's habeas counsel should have brought a claim challenging trial counsel's failure to object to the magazine mark testimony. It did so because the evidence discrediting Baldwin's testimony all originated after Mamou's trial and state habeas proceedings. This includes the academic literature criticizing magazine mark testimony, a disciplinary action against Baldwin in 2003, and Baldwin's recanting his expert testimony in another capital case, *Williams v. Quarterman*, 551 F.3d 352, 355–56 (5th Cir. 2008).

Mamou responds that the flaws in Baldwin's testimony were apparent prior to these events. He cites the affidavit of a firearms expert who opined that a competent ballistics expert would have spotted these weaknesses in Baldwin's testimony for Mamou and could have pointed them out to the jury or enabled his counsel to do so on cross examination. He also insists that the individuation fallacy underlying Baldwin's testimony was not a novel discovery, but rather a conceptual error that becomes apparent when logic and a rudimentary understanding of the scientific method are brought to bear on the topic. *See* Schwartz, *supra* at 4. After all, the error was revealed in a law review article, not a scientific journal.

But we need not determine whether the failure of state habeas counsel to challenge the magazine mark testimony rose to the level of ineffective assistance. Even assuming it did, raising that *Strickland* claim would not

have resulted in state habeas relief because excluding the magazine mark testimony likely would not have made a difference at trial. Mamou's attack on the magazine mark evidence leaves unchallenged other forensic evidence linking bullets taken from the bodies of Gibson and Holley at Lantern Point to the bullets extracted from Carmouche's body. Baldwin testified that the bullets shooting all three victims had the same caliber, the same number of "lands and grooves," and a right twist. This unchallenged testimony accomplished the same purpose as Baldwin's now-challenged magazine mark testimony: connecting the murder of Carmouche to the shootings at Lantern Point. And that forensic evidence was merely one piece in the evidentiary puzzle that corroborated other damning evidence: testimony that Mamou was the last person seen with Carmouche, Mamou's statements to Dodson boasting about shooting Carmouche, and Mamou's statements to his friend Anthony Trail that he had taken the Lexus and was in it "with a female" who "was giving him oral sex." Trail also testified that after he took Mamou to a bus station so he could return to Louisiana, Mamou called him and asked "what had been on the news about a missing person, Mary Carmouche." Because the magazine mark testimony was redundant of other, unimpeached forensic evidence proving the same thing, and other evidence also strongly pointed to Mamou's guilt, Mamou cannot establish prejudice from any failure to raise this *Strickland* claim to the state habeas court. As a result, he cannot overcome the procedural bar to his underlying claim that trial counsel should have objected to the magazine mark testimony.

**\* \* \***

We AFFIRM the judgment of the district court.