# United States Court of Appeals for the Fifth Circuit

No. 13-70001
CONSOLIDATED WITH
No. 19-70001

United States Court of Appeals
Fifth Circuit

**FILED**

August 9, 2021

Lyle W. Cayce
Clerk

WILLIAM SPEER,

*Petitioner—Appellant*,

*versus*

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent—Appellee*.

Appeals from the United States District Court
for the Eastern District of Texas
USDC 2:04-CV-269

ON PETITION FOR PANEL REHEARING

No. 13-70001
cons. w/ No. 19-70001

Before JONES, STEWART, and COSTA, *Circuit Judges*.

PER CURIAM:*

The motion for panel rehearing is GRANTED. We withdraw our prior opinion of February 25, 2021, and substitute the following:

In an earlier ruling in this procedurally complex case, a panel of our court remanded for the district court to consider whether William Speer could establish ineffective assistance of counsel at the state habeas stage. *See Speer v. Stephens*, 781 F.3d 784 (5th Cir. 2015). If he could, that might overcome his procedural default of a claim alleging that trial counsel was ineffective in failing to present mitigation evidence at the sentencing phase of his capital trial. *See id.*; *see generally Trevino v. Thaler*, 569 U.S. 413 (2013); *Martinez v. Ryan*, 566 U.S. 1 (2012). The district court ruled that Speer could not establish prejudice from any failure by counsel to adequately investigate mitigation evidence. We authorized an appeal from that ruling, *see Speer v. Lumpkin*, 824 F. App'x 240 (5th Cir. 2020), and now AFFIRM. We also AFFIRM the district court's decision to deny additional funding after it had approved $30,000 in investigation expenses.

I.

The convoluted procedural history of this case is recounted in our prior opinions. *See* 781 F.3d at 785; 824 F. App'x at 242-44. Although the parties address a number of potential issues arising out of the unusual procedural posture of the prior panel's remand, like the district court we conclude that Speer's inability to establish prejudice from any alleged failure to develop and use mitigation evidence presents the most straightforward resolution.

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 13-70001
cons. w/ No. 19-70001

Claims alleging that counsel was ineffective in failing to investigate mitigation evidence—sometimes called "*Wiggins* claims" after a Supreme Court case recognizing them, *see Wiggins v. Smith*, 539 U.S. 510 (2003)—are now common in capital habeas litigation. As with other ineffective assistance of counsel claims, a petitioner must show both (1) "that counsel's representation fell below an objective standard of reasonableness" and (2) a reasonable probability that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 688, 700 (1984). We assume *arguendo* that Speer can establish the first prong, because he fails to establish the second.[1]

The ultimate prejudice question is whether "at least one juror would have struck a different balance" at the sentencing phase had it heard the additional mitigating evidence. *Wiggins*, 539 U.S. at 537. "In evaluating that question, it is necessary to consider *all* the relevant evidence that the jury would have had before it had [defense counsel] pursued the different path— not just the mitigation evidence [he] could have presented, but also the [aggravating] evidence that almost certainly would have come with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009).

In conducting this necessarily speculative inquiry, *see Sears v. Upton*, 561 U.S. 945, 956 (2010), we start with the evidence the jury did have in front of it at the sentencing phase. In terms of aggravation evidence, the first and foremost fact is that the jury had just convicted Speer of committing a murder

---

[1] Similarly, we assume *arguendo* that Speer's *Wiggins* claim is a new one subject to *de novo* review if procedural default can be overcome because it fails the prejudice requirement even under *de novo* review. The premise of the previous panel's remand for a *Martinez/Trevino* inquiry was that Speers had procedurally defaulted this claim. 781 F.3d 786–87. In the context of a procedurally defaulted claim, there is no state court decision, so our review is *de novo*. *See Trevino v. Davis*, 829 F.3d 328, 341 (5th Cir. 2016).

while he was in prison serving a life sentence for capital murder. Speer murdered fellow prisoner Gary Dickerson in an attempt to ingratiate himself with a gang called the Texas Mafia. Not surprisingly, Dickerson's sister was the first witness during the sentencing phase.

The second government witness was Speer's codefendant from his first murder. Franklin Nanyoma recounted that 1990 incident. It began when John Collins and Nanyoma stole some checks from Collins's father, Jerry, and cashed them for $800–$900. Jerry Collins discovered what his son and Nanyoma had done and gave them until Wednesday to return the money, but they felt they had no way to do that. Speer offered to solve the dilemma by killing Jerry Collins. John Collins left the window unlocked at his father's home while Nanyoma drove Speer over. Speer got out, snuck inside, and a few minutes later there was a bang. Speer then returned calmly to the vehicle and they drove away, only to return a few minutes later when Speer decided he should check and make sure that Jerry Collins was dead. After Speer snuck back in the house and satisfied himself that Collins was dead, he and Nanyoma drove away.

Speer's mitigation case centered around two men, James Strickland and Gary Nixon, who volunteered as prison chaplains. They testified to Speer's conversion to Christianity, which apparently occurred after the state notified him that it was seeking the death penalty. These two men had seen many insincere prisoners but were convinced that Speer was sincere in his faith, especially because he had never asked them for anything. In his closing argument at the punishment phase, Speer's lawyer also cited testimony from the guilt phase that Speer did not have a disciplinary record in the prison before he killed Dickerson.

We now turn to the additional mitigation evidence that Speer argues his lawyer should have discovered. Speer contends that his lawyer should

have presented evidence of physical and verbal abuse Speer endured. His stepfather admitted using a belt to whip him.[2] His mother also whipped him with a belt and on one occasion picked him up by the throat. Speer was also beaten when he went to live with his biological father shortly before his first murder. One of those beatings resulted in black eyes and a cut on his face.

There was other domestic violence in Speer's childhood home; his stepfather would savagely beat his mother. Speer also points to verbal abuse from his stepfather and mother. Speer's stepfather, for instance, repeatedly called him "retarded" and told him he was "fat, worthless, and stupid." Drug and alcohol abuse were prevalent in his childhood home.

Speer also argues that he was bullied at school and had very few friends. Kids made fun of him because he was overweight and placed in special education classes. His cousin estimates that Speer had perhaps one real friend. To try and make friends, Speer would do most anything kids asked him to do. Once some kids convinced him to destroy a neighbor's outdoor pool. Other times it was simpler stuff like throwing a rock or jumping out of a tree. Despite Speer's efforts, these people never became his friends.

This desire to please others, which Speer already displayed in grade school, motivated both murders he committed: Speer was not involved in stealing checks from Jerry Collins, but volunteered to kill Collins as a favor to the thieves from whom Collins had demanded repayment; Speer's killing of Gary Dickerson was an attempt to ingratiate himself with gang leaders. The deep roots of this impulse, which one doctor diagnosed as dependent personality disorder, highlight what the district court described as the

---

[2] His stepfather later murdered his mother, but that occurred years after Speer was already imprisoned for his first murder. *See McGhee v. State*, 2011 WL 286119 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd, untimely filed) (unpublished).

double-edged nature of much of this mitigation evidence. Although much of it might have painted him in a sympathetic light, some of it also could be viewed as additional evidence of future dangerousness. *See Cullen v. Pinholster*, 563 U.S. 170, 201 (2011) (recognizing that new evidence showing a history of crime, mental illness, and drug abuse in defendant's family is "by no means clearly mitigating as the jury might have concluded that [the defendant] was simply beyond rehabilitation"); *Wong,* 558 U.S. at 26 (explaining that when evaluating prejudice a court must consider the "bad evidence [that] would have come in with the good").

In addition to the dependent personality disorder that appears to have motivated his first two murders and could continue to make Speer dangerous, the district court recognized the following as double-edged evidence: At just four years old, Speer was kicked out of daycare for injuring another student. In second grade, this violent streak reemerged when he threw a desk at his teacher. The same psychologist that found him cooperative and pleasant determined that he had longstanding, unresolved anger problems. He also set fires as a child. And one part of the "new" evidence undercuts the mitigation testimony from the prison chaplains that was presented at his trial: Speer told one psychologist in 1991 that he had recently become a Christian, years before he would tell the volunteer chaplains the same recent conversion story.

After recalibrating both the aggravating and mitigating sides of the ledger to account for the evidence that trial counsel did not present, we conclude that no juror would have reached a different conclusion. Speer has identified much more to put on the mitigation scale. But the additional mitigation evidence is not as strong as the undiscovered evidence in successful *Wiggins* cases. Take *Wiggins* itself. Trial counsel failed to introduce evidence showing that the defendant had suffered from severe

deprivation, abuse, and rape in foster care and he had no violent history (except the charged crime) to offset that mitigation evidence. *See Wiggins*, 539 U.S. at 534–35. Terry Williams was criminally neglected as a child and was a model prisoner—helping to disrupt a prison gang and find and return a guard's wallet. *Williams*, 529 U.S. at 396. And contrary to the unrebutted story the jury heard that Demarcus Sears grew up in a "stable and advantaged" environment, the defendant actually was subjected to sexual abuse and alcohol and drug abuse from an early age that left him in the first percentile of cognitive ability. *Sears v. Upton*, 561 U.S. 945, 947, 948–49 (2010). *Rompilla v. Beard* is, in some respects, closer to this case. 545 U.S. 374 (2005). The defense lawyer failed to uncover evidence of significant domestic abuse during Rompilla's childhood, though that abuse was even more severe than the evidence here.[3] Thus the mitigation evidence Speer points to, while substantial, is not as substantial as that in the cases finding prejudice from counsel's failure to fully investigate.

---

[3] The Supreme Court quoted the following from the Third Circuit's opinion:

> Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.

545 U.S. at 391–92.

But the biggest difference between Speer's *Wiggins* claim and successful ones is on the aggravating evidence side of the scale. The question of future dangerousness often focuses on the likelihood the defendant will be violent in prison (because the defense can argue that alternatives of a lengthy or lifetime prison sentence protect the general public from the defendant). *Cf. Kelly v. South Carolina*, 534 U.S. 246, 253 (2002) ("[E]vidence of violent behavior in prison can raise a strong implication of 'generalized . . . future dangerousness'" (quoting *Simmons v. South Carolina*, 512 U.S. 154, 171 (1994)). Because of the salience of the violence-in-prison concern, experts often testify about the likelihood a defendant will harm others inside the prison. *See, e.g.*, *Garcia v. Stephens*, 757 F.3d 220, 222 (5th Cir. 2014) (discussing psychologist who testified about prison security measures that can impact future dangerousness); *Scheanette v. Quarterman*, 482 F.3d 815, 821 (5th Cir. 2007) (discussing expert opinion there was an 18.8% chance defendant would be violent in prison); *Murphy v. Davis*, 737 F. App'x 693, 698, 704 (5th Cir. 2018) (discussing defense expert who testified that administrative segregation would prevent defendant from posing a danger in prison); *Griffith v. Quarterman*, 196 F. App'x 237, 239 (5th Cir. 2006) (discussing expert who testified defendant would not be dangerous in prison if he was not around women). Guesswork on that paramount consideration was not needed here. While in prison for murder, Speer murdered again. It is difficult to think of more probative evidence on whether Speer might commit violent acts while incarcerated than the fact that he already had.

For these reasons as well as the additional ones the district court discussed, it was not error to conclude that each juror would have reached the same sentencing decision even with the additional evidence that Speer now argues should have been presented at his trial.

## II.

Speer also challenges the district court's refusal to grant a hearing and to issue a third order funding a mitigation expert. We review both of these claims for abuse of discretion. *Ayestas v. Davis*, 138 S. Ct. 1080, 1094 (2018) (funding request); *Schiro v. Landrigan*, 550 U.S. 465, 475 (2007) (hearing).

We start with the funding issue. Soon after our court's 2015 remand of this case to allow for the appointment of supplemental counsel, the magistrate judge approved $15,000 in "preliminary funding" for a mitigation expert.

The next year Speer asked for $30,000 more. The magistrate court judge found that the request was for services "of an unusual character of duration," so as to allow funding beyond the statute's default $7,500 cap. *See* 18 U.S.C. § 3599(g)(2). The court concluded, however, that the amount requested was "excessive." As a result, the magistrate judge approved only an additional $15,000, subject to final approval of the Chief Judge of the Court of Appeals, which was granted. In its order partially granting the funding request, the magistrate judge placed Speer "on notice that the amount approved by this order may be the final amount that will be approved in this case, and it should be treated as such."

Despite the warning, Speer later sought additional funding of $15,000 (the same amount reduced from the prior request). The magistrate judge denied the request. He first noted that the court had already approved four times the presumptive maximum in section 3599(g)(2). It next reminded Speer of the court's earlier "admonishment" that it would not approve more than $30,000. Finally, the court observed that the request $45,000 in total funding would exceed "the norm for expert funding in capital habeas proceedings."

9

Speer argues that the court abused its discretion in denying the additional $15,000 because it did not address considerations that *Ayestas v. Davis*, 138 S. Ct. 1080, 1094 (2018), stated can inform whether a funding request is "reasonably necessary" within the meaning of section 3599(f). Those considerations are "the potential merit of the claims that the applicant wants to pursue, the likelihood that the services will generate useful and admissible evidence, and the prospect that the applicant will be able to clear any procedural hurdles standing in his way." *Id.*

Here, however, the court did find that funding was reasonably necessary. Beyond that, it found that there was a need "for services of an unusual character or duration" that warranted funding in excess of the presumptive statutory cap. The amount of such excess funding is a highly discretionary determination. And by the time a court is considering a request for a third disbursement of funds, it is quite familiar with the case and the funding needs. We thus see no requirement that its order include the "claim-by-claim" analysis that Speer seeks. As a result, the district court did not abuse its discretion in refusing to grant more than $30,000 in funding.

We likewise see no abuse of discretion in the denial of a hearing. The prejudice analysis that the district court conducted and that we affirmed is a legal analysis that would not have benefitted from testimony.

* * *

The judgment of the district court is AFFIRMED.