(Slip Opinion)

# Use of the HEROES Act of 2003 to Cancel the Principal Amounts of Student Loans

The Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904, grants the Secretary of Education authority to reduce or eliminate the obligation to repay the principal balance of federal student loan debt, including on a class-wide basis in response to the COVID-19 pandemic, provided all other requirements of the statute are satisfied.

August 23, 2022

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF EDUCATION

The Higher Education Relief Opportunities for Students Act of 2003, Pub. L. No. 108-76, 117 Stat. 904 (2003) (codified at 20 U.S.C. §§ 1098aa–1098ee) ("HEROES Act of 2003," or "HEROES Act"), vests the Secretary of Education ("Secretary") with expansive authority to alleviate the hardship that federal student loan recipients may suffer as a result of national emergencies. The Act provides that the Secretary may "waive or modify any statutory or regulatory provision applicable to" federal student loan programs if the Secretary "deems" such actions "necessary to ensure that" certain statutory objectives are achieved. 20 U.S.C. § 1098bb(a)(1)–(2). One of those objectives is to ensure that "recipients of student financial assistance . . . are not placed in a worse position financially in relation to that financial assistance because of" a national emergency. *Id.* § 1098bb(a)(2)(A). In 2020, the Secretary invoked this authority in response to the COVID-19 pandemic to suspend the repayment obligation and to waive interest payments on student loans for every borrower in the United States with a loan held by the federal government. *See* Federal Student Aid Programs, 85 Fed. Reg. 79,856, 79,862 (Dec. 11, 2020). Prior Secretaries have exercised the same authority to categorically waive statutory and regulatory obligations for borrowers residing or working in a disaster area in connection with a national emergency and for borrowers who suffered economic hardship as a result of a national emergency. *See, e.g.*, Federal Student Aid Programs, 77 Fed. Reg. 59,311, 59,314 (Sept. 27, 2012); Federal Student Aid Programs, 68 Fed. Reg. 69,312, 69,313–14 (Dec. 12, 2003).

You have asked whether the HEROES Act authorizes the Secretary to address the financial hardship arising out of the COVID-19 pandemic by reducing or canceling the principal balances of student loans for a broad class of borrowers. We conclude that the Act grants that authority. The plain text of the HEROES Act authorizes the Secretary to "waive or modify *any* statutory or regulatory provision applicable to" the federal student loan program, 20 U.S.C. § 1098bb(a)(1) (emphasis added), an authority that encompasses provisions applicable to the repayment of the principal balances of loans, provided certain conditions are met. We conclude that targeting relief towards those individuals who suffered financial hardship because of COVID-19 and who otherwise satisfy the requirements of the Act accords with the Act's requirement that the waiver or modification "be necessary to ensure that" student loan recipients who are "affected" by a national emergency "are not placed in a worse position financially" with respect to their loans as a result. *Id.* § 1098bb(a)(2). Further, we believe that the Secretary may reasonably conclude that class-wide debt relief in these circumstances is appropriate.

# I.

## A.

The federal government administers three student loan programs. Under the William D. Ford Federal Direct Loan Program, the federal government makes loans directly to borrowers, who are then responsible for repaying the government. *See* 20 U.S.C. §§ 1087a–1087j. Under the Federal Family Education Loan ("FFEL") Program and the Federal Perkins Loan Program, loans are made by private or state-based lenders, including schools, which in turn transfer their loans to the federal government in certain circumstances. *See id.* §§ 1071–1087-4; *id.* §§ 1087aa–1087ii. Although authority for the latter two programs expired in 2010 and 2017, respectively, many loans issued pursuant to those programs remain outstanding. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat 1029; Federal Perkins Loan Program Extension Act of 2015, Pub. L. No. 114-105, 129 Stat 2219. As of the end of the second quarter of 2022, about 43.0 million borrowers had loans under the three federal student loan programs, and their debts collectively amounted to approximately $1.62 trillion. *See* U.S. Dep't of

Education, Federal Student Loan Portfolio, Summary, https://studentaid.gov/data-center/student/portfolio (last visited Aug. 21, 2022).

The statutory provisions governing each student loan program are set forth in title IV of the Higher Education Act of 1965, Pub. L. No. 89-329, 79 Stat. 1219 (codified as amended at 20 U.S.C. §§ 1070 *et seq.*) ("HEA"). That title specifies the terms and conditions of each type of federal loan and the consequences of a borrower's failure to make payment. *See, e.g.*, 20 U.S.C. §§ 1080, 1087e, 1087dd. It also includes a number of provisions allowing for the cancellation of student loans in certain circumstances, such as when a borrower works in a public service profession for a set period. *See id.* §§ 1078-10, 1078-11, 1087j, 1087ee.

In addition, the Secretary has supplemented the provisions of title IV by promulgating a detailed series of regulations. Those regulations set forth a borrower's obligation to repay loans. *See, e.g.*, 34 C.F.R. § 682.102 (providing that "[a] borrower is obligated to repay the full amount" of a loan under the FFEL Program); *id.* § 685.207 (providing that "[a] borrower is obligated to repay the full amount of a Direct Loan"). And they, too, provide for a number of circumstances in which loans may be canceled or discharged. *See, e.g.*, 34 C.F.R. § 682.402 (FFEL discharges); *id.* §§ 685.212–218 (Direct Loan discharges).

## B.

The precursor of the HEROES Act of 2003 was the Higher Education Relief Opportunities for Students Act of 2001, Pub. L. No. 107-122, 115 Stat. 2386 (2002). Enacted a few months after the terrorist attacks of September 11, that statute was intended to "provide the Secretary of Education with specific waiver authority to respond to conditions in the national emergency declared by the President on September 14, 2001." 115 Stat. at 2386. To that end, Congress authorized the Secretary to "waive or modify any statutory or regulatory provision applicable to" student loan programs under title IV "as may be necessary to ensure that" the Secretary could alleviate hardships individuals suffered because of September 11 and any subsequent terrorist attacks. *Id.* at 2386, 2388.

Shortly before this statute was slated to expire, Congress extended and broadened its grant of authority by enacting the HEROES Act of 2003. Like its predecessor, the HEROES Act of 2003 grants the Secretary

expansive power to "waive or modify" any provisions of title IV and its implementing regulations. 20 U.S.C. § 1098bb(a)(1). It provides:

> Notwithstanding any other provision of law, unless enacted with specific reference to this section, the Secretary . . . may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [HEA] . . . as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by [20 U.S.C. § 1098bb(a)(2)].

*Id.* The Act then specifies in section 1098bb(a)(2) that "[t]he Secretary is authorized to waive or modify any provision described in [20 U.S.C. § 1098bb(a)(1)] as may be necessary to ensure that" certain listed objectives are achieved. *Id.* § 1098bb(a)(2). The first of those objectives is "to ensure that . . . recipients of student financial assistance under title IV of the [HEA] who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." *Id.* § 1098bb(a)(2)(A).

Several provisions of the Act underscore the breadth of the Secretary's waiver and modification power. The Secretary is authorized to disregard notice-and-comment requirements when implementing the Act; instead, the Secretary need only publish a notice setting forth "the waivers or modifications . . . the Secretary deems necessary to achieve the purposes of this section" and stating "the terms and conditions to be applied in lieu of such statutory and regulatory provisions." *Id.* § 1098bb(b)(1)–(2). In addition, "[t]he Secretary is not required to exercise the waiver or modification authority . . . on a case-by-case basis." *Id.* § 1098bb(b)(3). And the Secretary is exempt from otherwise-applicable procedural requirements that would delay the implementation of waivers and modifications. *Id.* § 1098bb(d).

Finally, the Act defines the "affected individuals" whom the Secretary may invoke the statute to protect. Unlike its predecessor, the HEROES Act of 2003 does not limit relief to individuals who suffered hardship as a result of September 11 or other terrorist attacks. The Act instead applies to any presidentially declared national emergency. *Id.* § 1098ee(4). And it allows the Secretary to provide relief to any member of the military or National Guard who is "serving on active duty" or "performing qualifying

National Guard duty" "during a . . . national emergency," as those terms are defined in the Act; any individual who "resides or is employed in an area that is declared a disaster area . . . in connection with a national emergency"; and any individual who "suffered direct economic hardship as a direct result of a war or other military operation or national emergency." *Id.* § 1098ee(2), (5)–(6).

The HEROES Act of 2003 was originally set to expire on September 30, 2005. Pub. L. No. 108-76, § 6, 117 Stat. at 908. In 2005, however, Congress extended the Secretary's authority for two years. Pub. L. No. 109-78, 119 Stat. 2043. In 2007, it made the Act permanent. Pub. L. No. 110-93, 121 Stat. 999. In making the Act permanent, Congress stated its "sense" that the Act "addresses the unique situations that active duty military personnel and other affected individuals may face" and that "the provisions authorized by such Act should be made permanent, thereby allowing the Secretary of Education to continue providing assistance to active duty service members and other affected individuals and their families." *Id.* § 1(1)–(2), 121 Stat. at 999.

## C.

Since the passage of the HEROES Act, the Secretary of Education has repeatedly invoked the Act's waiver or modification authority to issue broad-based relief to student loan recipients.

In 2003, the Secretary issued a series of more than a dozen waivers and modifications, most of which were deemed applicable to "ALL" persons who met the statutory definition of "affected individuals." 68 Fed. Reg. at 69,313–14. Those waivers and modifications included alterations to the requirements for loan deferrals, extensions of the maximum period of loan forbearance for Perkins loans, and waivers of the requirement that students return overpayments of certain grant funds. *Id.* The Secretary extended the duration of these waivers and modifications without substantive change in 2005 and 2007. *See* Federal Student Aid Programs, 70 Fed. Reg. 61,037 (Oct. 20, 2005); Federal Student Aid Programs, 72 Fed. Reg. 72,947 (Dec. 26, 2007). In 2007, when Congress reenacted the statute without amendment, it expressed its "sense" that the Secretary of Education should "continue providing assistance to . . . affected individuals and their families." 121 Stat. at 999.

In 2012, the Secretary updated the waivers and modifications issued in 2003 to account for intervening changes in the HEA and its implementing regulations. *See* 77 Fed. Reg. at 59,311. As in 2003, many of the waivers and modifications applied to "ALL affected individuals." *Id.* at 59,313. The Secretary retained the substance of nearly all of the earlier waivers, while adding a waiver of provisions requiring annual reevaluation of a borrower's eligibility for certain repayment plans. *Id.* at 59,317. The Secretary once again extended these waivers and modifications in 2017 without change. *See* Federal Student Aid Programs, 82 Fed. Reg. 45,465 (Sept. 29, 2017).

Most recently, in 2020 and 2021, the Secretary repeatedly invoked the HEROES Act to provide relief in response to the COVID-19 pandemic. First, on March 20, 2020, the Department of Education relied on the HEROES Act to pause the accrual of interest and to allow borrowers to cease repayment for all student loans held by the federal government from March 13, 2020 until March 27, 2020. *See* Federal Student Aid, U.S. Dep't of Education, Fiscal Year 2020 Annual Report 38 (Nov. 16, 2020), https://www2.ed.gov/about/reports/annual/2020report/fsa-report.pdf. On March 27, 2020, Congress directed the Secretary to extend these policies until October 1, 2020. Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 3513, 134 Stat. 281, 404 (2020) ("CARES Act"). When that direct statutory authorization expired, the Secretary invoked the HEROES Act once again to waive interest payments and the accrual of interest for all borrowers from October 1, 2020 until December 31, 2020. *See* Fiscal Year 2020 Annual Report at 38.

In December 2020, the Secretary issued a series of additional waivers and modifications under the HEROES Act. *See* 85 Fed. Reg. at 79,856. These waivers applied to every "student enrolled in a postsecondary institution" and every borrower "whose Federal student loans provided under title IV are in repayment." *Id.* at 79,857. They made a bevy of changes, including loosening eligibility requirements for federal loans and continuing the waiver of any obligation to pay interest. *Id.* at 79,861–63. They also expanded eligibility for borrower defenses to repayment by allowing certain borrowers with Perkins or FFEL loans to have their claims evaluated under standards more beneficial to borrowers. *See id.* at 79,862–63; *see also* Alexandra Hegji, Cong. Research Serv., R46314, *Federal Student Loan Debt Relief in the Context of COVID-19* at 19 &

n.107 (updated Feb. 28, 2022), https://crsreports.congress.gov/product/pdf/R/R46314. Since then, the Secretary has ceased collection activity and expanded the pause on interest accrual to all defaulted FFEL loans, and also has waived certain administrative requirements for borrowers with discharged loans to ensure these borrowers' loans are not reinstated. *See* Press Release, U.S. Dep't of Education, Department of Education Announces Expansion of COVID-19 Emergency Flexibilities to Additional Federal Student Loans in Default (Mar. 30, 2021); Press Release, U.S. Dep't of Education, Education Department Announces Relief for Student Loan Borrowers with Total and Permanent Disabilities During the COVID-19 Emergency (Mar. 29, 2021).

### D.

Just over one month after the December 2020 waivers and modifications were issued, on January 12, 2021, the Principal Deputy General Counsel of the Department of Education issued a memorandum discussing the scope of the Secretary's authority under the HEROES Act and title IV of the HEA. *See* Memorandum for Betsy Devos, Secretary of Education, from Reed D. Rubinstein, Principal Deputy General Counsel, Department of Education, *Re: Student Loan Principal Balance Cancellation, Compromise, Discharge, and Forgiveness Authority* (Jan. 12, 2021) ("Rubinstein Memorandum"). This memorandum stated that the Secretary's prior exercises of waiver and modification authority during the COVID-19 pandemic were "appropriate." *Id.* at 1. But it expressed the view that neither the HEA nor the HEROES Act authorizes the Secretary to "cancel, compromise, discharge, or forgive, on a blanket or mass basis, principal balances of student loans, and/or to materially modify the repayment amounts or terms thereof." *Id.*

The memorandum focused its analysis on the HEA but also offered three brief arguments specific to its conclusion regarding the HEROES Act. It characterized the Act's authority as "limited," allowing only for waivers and modifications designed "to put . . . 'affected individuals' . . . in the same position financially in relation to their [student] loans as if the national emergency had not occurred." *Id.* at 6. It noted that the Act makes references to "discharge[s]" and "return[s]," which it understood to indicate that "Congress intended loans to be repaid." *Id.* And it interpreted the statutory term "modify" to mean "'to change moderately or in minor

fashion.'" *Id.* (quoting *MCI Telecommc'ns Corp. v. Am. Tel. & Tel. Corp.*, 512 U.S. 218, 225 (1994)). More broadly, the memorandum suggested that a categorical waiver of the obligation to repay student debt would be at odds with the "many specific provisions for cancellation . . . of student loan principal balances" in the HEA and would "transform[ the] carefully cabined HEA settlement authority into a general administrative dispensing power." *Id*. at 6; *see also id.* at 3–4 (arguing that these specific provisions forestall reading the Secretary's general authority to "compromise, waive, or release any right, title, claim, lien, or demand" to authorize the Secretary to cancel student loans "on a blanket or mass basis").

You have now asked us to provide an opinion on whether the HEROES Act authorizes the Secretary to waive or modify the obligation to repay the principal balance of student loan debt on a broad and categorical basis in connection with the COVID-19 pandemic. Your request encompasses two questions. First, we must resolve whether the Act permits the Secretary to waive or modify the obligation to repay the principal balance of student loan debt. Second, if so, we must determine whether broad and categorical reduction or cancellation of the principal balances of student loans as a response to the COVID-19 pandemic could be structured to comport with the remaining requirements of the Act. We address each of these questions in turn.

## II.

We first consider whether, when all other statutory requirements are met, the HEROES Act grants the Secretary authority to reduce or eliminate the obligation to repay the principal balance of student loan debt. We conclude that it does. By its plain text, the HEROES Act authorizes the Secretary to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV." 20 U.S.C. § 1098bb(a)(1). Because the obligation to repay principal balances is governed by such statutory or regulatory provisions, *see infra* Part II.A.1, the HEROES Act enables the Secretary to reduce or eliminate that obligation through waiver or modification of those provisions. The surrounding clauses of the statute confirm the scope of that authority. And we find nothing in the statute's purpose, history, or any other indicia of statutory meaning to undermine that plain-text interpretation.

## A.

Section 1098bb(a)(1) provides:

> Notwithstanding any other provision of law, unless enacted with specific reference to this section, the Secretary of Education . . . may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [HEA] as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2).

20 U.S.C. § 1098bb(a)(1). This provision contains three clauses. The central clause is a far-reaching grant of authority: "[T]he Secretary of Education . . . may waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [HEA]." That grant of authority is preceded by a notwithstanding clause, which provides that the Secretary may invoke this waiver and modification authority "[n]otwithstanding any other provision of law, unless enacted with specific reference to this section." And the grant of authority is followed by a clause specifying that the Secretary may invoke this authority "as the Secretary deems necessary in connection with a war or other military operation or national emergency to provide the waivers or modifications authorized by paragraph (2)."

## 1.

The provisions requiring individuals to repay student loans are "statutory or regulatory provision[s] applicable to the student financial assistance programs under title IV." 20 U.S.C. § 1098bb(a)(1). These provisions are set forth in the U.S. Code and the Code of Federal Regulations. *See, e.g.*, 20 U.S.C. § 1087dd(c) (requiring loans agreements to "provide[] for repayment of the principal amount of the loan"); 34 C.F.R. § 685.207 ("[a] borrower is obligated to repay the full amount of a Direct Loan"); *id.* § 682.102 ("[a] borrower is obligated to repay the full amount" of a loan under the FFEL Program); *id.* § 682.209 ("Repayment of a loan."). And they are "applicable to the student financial assistance programs under title IV" because they direct how financial assistance provided under title IV should be repaid. *See Applicable*, Black's Law Dictionary (11th ed.

2019) (defining "applicable" as "affecting or relating to a particular person, group, or situation; having direct relevance").

The Secretary may accomplish the cancellation or reduction of student debt by "waiv[ing] or modify[ing]" these provisions. 20 U.S.C. § 1098bb(a)(1). The ordinary meaning of the term "waive" is to "refrain from insisting upon." *Waive*, Oxford English Dictionary, https://www. oed.com/view/Entry/225159 (last visited Aug. 21, 2022) ("refrain from insisting upon, . . . to forbear to claim or demand"); *see Waive*, Black's Law Dictionary ("refrain from insisting on (a strict rule, formality, etc.); to forgo"). An official who "waives" a legal obligation thus exempts an individual from the duty to comply with that obligation.[1] Accordingly, by "waiv[ing]" the provisions setting forth the obligation to repay student debt, the Secretary would eliminate an individual's duty to comply with those obligations.

The Secretary also may "modify" those provisions and thereby reduce the scope of individuals' payment obligations. The word "modify" means "[t]o make somewhat different" or "to reduce in degree or extent." *Modify*, Black's Law Dictionary. The degree or extent of change authorized by the term "modify" can sometimes connote only limited or incremental changes. *MCI Telecommc'ns Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 225 (1994). In other circumstances, however, it can refer to "substantial" changes up to and including the elimination of legal obligations in their entirety. *See, e.g.*, *Validity of Congressional-Executive Agreements That*

---

[1] Statutes frequently use the term "waive" in this manner. *See, e.g.*, 8 U.S.C. § 1187 (authorizing the Secretary of Homeland Security to "waive" visa requirements on a class-wide basis for all foreign nationals coming from designated countries); 10 U.S.C. § 1408(a)(4)(A)(ii) (permitting veterans to "waive[] retired pay required by law in order to receive [disability] compensation"); 42 U.S.C. § 1320b-5 (permitting the Secretary of Health and Human Services "to temporarily waive or modify" regulations to ensure the provision of health care services during national emergencies); 20 U.S.C. § 10012(a)–(b) (permitting the Secretary of Education to "waive or modify any [financial effort] requirement" of the Individuals with Disabilities Education Act for "fiscal year 2009, . . . 2010, or . . . 2011"); 50 U.S.C. § 1701 (permitting the President to waive indefinitely sanctions on foreign persons responsible for the use of civilians as human shields); 20 U.S.C. § 7861(a) (permitting the Secretary of Education to waive requirements that the No Child Left Behind Act imposes on federal education subsidies); 42 U.S.C. § 18052(a)(1)–(2) (permitting the Secretaries of Health and Human Services and of the Treasury to waive Affordable Care Act health care insurance exchange requirements, minimum plan coverage requirements, and individual mandates upon state request).

*Substantially Modify the United States' Obligations Under an Existing Treaty*, 20 Op. O.L.C. 389, 391–92 (1996); *Congressionally Mandated Notice Period for Withdrawing from the Open Skies Treaty*, 44 Op. O.L.C. __, at \*27 (Sept. 22, 2020) (quoting President Wilson as defining "the power of modifying an existing treaty" as the power of "adding or striking out provisions"). To determine which meaning Congress intended in a particular statute, we read the term in light of "contextual indications" provided by the statutory scheme as a whole. *MCI*, 512 U.S. at 226; *see also Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 413 (2012) ("Ultimately, context determines meaning." (quotation marks omitted)).

Here, context makes clear that the term "modify" authorizes the Secretary to reduce, by any degree, the obligation to comply with statutory or regulatory provisions. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012) ("[a]ssociated words bear on one another's meaning"); *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 ("a word is known by the company it keeps"). The term "modify" appears as part of the phrase "waive or modify." 20 U.S.C. § 1098bb(a)(1). And as just noted, the term "waive" confers the power to excuse an individual from legal obligations in their entirety. In that light, it seems clearly wrong to interpret the neighboring term "modify" as limited to authorizing the Secretary to make only minor or incremental changes to provisions of the student loan program. That would put the Secretary to a peculiar choice: either eliminate legal obligations wholesale or alter them to a marginal degree—but make no changes in between. Here, the better interpretation is clearly that Congress granted the Secretary the power both to eliminate legal obligations ("waive") and to reduce them to any extent short of waiver ("modify") as long as the other requirements of the statute are satisfied. For example, the Secretary might alter the relevant regulations to provide that they would require repayment only of a portion of a loan. Or the Secretary could change them to state that the regulations apply only to certain borrowers or are limited to particular circumstances. Changes of this nature fall within the ambit of the Secretary's power to "modify," as that term is naturally understood.[2]

---

[2] You have advised us that these changes—in addition to vitiating any statutory or regulatory obligation of repayment—would nullify any contractual requirement for repay-

**2.**

The surrounding clauses of section 1098bb(a)(1) reinforce our conclusion that the Secretary's power to "waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV" includes the authority to eliminate or reduce the obligation to repay student loan debt.

*First*, the statute's "notwithstanding" clause makes clear that no other statutory provision implicitly limits the Secretary's authority to waive or modify. In statutes, the term "notwithstanding" "shows which provision prevails in the event of a clash." *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 939 (2017) (quotation marks omitted); *see Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) ("the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section"). The notwithstanding clause thus provides that, in the event of a conflict between section 1098bb and another provision, section 1098bb takes precedence. And it underscores the strength of that rule by providing that another provision will govern only if it contains a "specific reference" to section 1098bb.

We have found no provision of law that expressly limits the Secretary's authority to waive or modify the obligation to repay student debt. The statutory and regulatory provisions governing student loan repayments contain no reference to section 1098bb. Nor do they state that they limit the authority granted by that section. And we know of no other provision of law that contains such a statement. The Secretary's waiver and modification authority thus applies, "[n]otwithstanding" the provisions governing student loan debt, and that authority may be used to waive or modify the obligations those provisions impose.

*Second*, this understanding of the authority granted by section 1098bb(a)(1) is supported by the provision's final clause. That clause, taken together with section 1098bb(a)(2), sets forth the "purposes" for

---

ment stemming from the borrowers' loan agreements because those agreements expressly state that they are subject to the HEA and its implementing regulations. *See* Memorandum for the Office of Legal Counsel, U.S. Dep't of Justice, from the Office of General Counsel, U.S. Dep't of Education, *Re: Questions on Broad-Based Debt Cancellation* at 2 (Aug. 16, 2021).

which the Secretary may exercise the waiver and modification authority. *See id.* § 1098bb(b)(1). These clauses define one of the core purposes for which Congress granted waiver and modification authority as being to "ensure" that recipients of financial assistance "are not placed in a worse position financially in relation to that financial assistance" because of a military operation or other national emergency. *Id.* § 1098bb(a)(1)–(2). We have no difficulty conceiving of circumstances in which the Secretary's authority to eliminate or reduce a borrower's obligation to repay student loan debt might be central to achieving this objective. For example, the Secretary might reasonably find that debt cancellation would "ensure" that a soldier permanently disabled in a military operation and unable to work was "not placed in a worse position financially in relation to [her] financial assistance because of" her military service. *Id.*; *see id.* § 1098ee(2)(A). In this and other hypothetical circumstances we can imagine, the aggregate financial harm suffered by borrowers as a result of their status as affected individuals might make cancellation of some or all of their federal student indebtedness appropriate. Given the breadth of the statute as discussed more fully below, *see infra* Part III.D, we think this sort of debt cancellation or reduction fits well within the range of actions that the Secretary might choose to achieve the Act's purposes.

### 3.

The Rubinstein Memorandum by and large did not engage with any of this textual evidence in its cursory analysis of the HEROES Act. The memorandum failed to consider the implications of the fact that the statute grants the Secretary authority both to "waive" and to "modify" provisions of law. *Cf.* Rubinstein Memorandum at 6 (considering solely the word "modify"). The memorandum also did not acknowledge the statute's "notwithstanding" clause or consider whether that clause forecloses the negative inference the memorandum proposes to draw from provisions of the HEA that authorize cancellation of loan principal in different situations. *See id.* at 6–7. Indeed, the memorandum failed even to acknowledge the simple textual point that the statute grants the Secretary authority to waive or modify "*any* statutory or regulatory provision applicable to the student financial assistance programs under title IV of the Act," 20 U.S.C. § 1098bb(a)(1) (emphasis added), and that the stat-

utes and regulations imposing the obligation to repay student loans are examples of such provisions.

The textual evidence that the Rubinstein Memorandum did consider is not sufficient to overcome the powerful indicia that the statute grants the Secretary authority to eliminate or reduce the obligation to repay student loans. The memorandum observed that "the Secretary's delegated authority is limited . . . to the waiver or modification of statutory requirements" to achieve the objectives set forth in section 1098bb(a)(2). Rubinstein Memorandum at 6. The memorandum, however, did not explain why the elimination or reduction of student loan debt cannot be deemed a "necessary" means of "ensur[ing]" that those objectives are achieved. 20 U.S.C. § 1098bb(a)(1)–(2).

The Rubinstein Memorandum also suggested that the existence of "many specific provisions for cancellation, compromise, discharge, or forgiveness of student loan principal balances" in the HEA precludes the Secretary from exercising the waiver and modification authority to cancel student loan debt. Rubinstein Memorandum at 6 (pointing to provisions that provide for loan cancellation or forgiveness in certain defined circumstances). Invoking the canon that "the specific governs the general," the memorandum suggested that these provisions set forth the exclusive circumstances in which the Secretary may cancel student loan debt and thus implicitly bar the Secretary from invoking section 1098bb(a)(1) or other HEA authorities for that same purpose. *Id.* at 3–4, 6–7. The notwithstanding clause, however, cautions against inferring that Congress silently precluded use of section 1098bb to cancel student debt merely by enacting other cancellation authority applicable in other specific situations. Besides, although section 1098bb may provide the Secretary with powerful tools to address the circumstances encompassed by the HEROES Act, it also covers only a limited set of circumstances (when there is a "war or other military operation or national emergency," 20 U.S.C. § 1098bb(a)(1)), and it authorizes relief only for a defined class of individuals affected by those emergencies, *id.* § 1098ee(2) (defining the term "affected individual"), to accomplish limited objectives such as "ensur[ing]" these individuals are not "placed in a worse position financially" in relation to their loans, *id.* § 1098bb(a)(2). It is not at all clear that the carefully drawn emergency authority in the HEROES Act is more general than the provisions authorizing student debt relief in non-emergency

circumstances,[3] making the Rubinstein Memorandum's reliance on the "specific governs the general" canon inapposite.

The memorandum further argued that Congress's references to "defaults" and "return[s]" of student loan funds in two subparagraphs of section 1098bb(a)(2) indicate that Congress "intended loans to be repaid, even after the exercise of HEROES Act authority." Rubinstein Memorandum at 6. But section 1098bb(a)(2)(B) lists the avoidance of "defaults" as part of a larger set of possible objectives the Secretary may pursue ("to ease the burden on such students *and* avoid . . . violations or defaults" (emphasis added)). The fact that one of several possible goals that the Secretary may pursue is to "avoid . . . defaults" does not suggest that *every* invocation of waiver or modification authority under this provision must preserve some balance on an individual's student loan. And section 1098bb(a)(2)(D) simply authorizes waivers and modifications "to ensure that . . . the amount a student is required to return may be modified so that no overpayment will be required to be returned or repaid" if certain conditions are satisfied. We see nothing in this provision that would prevent the Secretary from waiving or modifying other statutory or regulatory obligations, separate and apart from any obligation to return "overpayments," such that the remaining balance on a student's loan is set to zero.

As a final textual argument, the Rubinstein Memorandum suggested that reading section 1098bb(a)(2) to permit the cancellation or reduction of student loan debt would contravene the principle that Congress "'does not . . . hide elephants in mouseholes.'" Rubinstein Memorandum at 2

---

[3] Consider, for example, the statutory provision authorizing loan forgiveness for borrowers with income-based repayment plans. *See* 20 U.S.C § 1098e. When establishing a new regulatory program to implement this provision, the Department of Education estimated that six million borrowers would be eligible and that two million would enroll. *See* Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 Fed. Reg. 67,204, 67,229 (Oct. 30, 2015). And within a few years of the program's launch, approximately 2.17 million borrowers had in fact enrolled. *See* Alexandra Hegji et al., Cong. Research Serv., R43571, *Federal Student Loan Forgiveness and Loan Repayment Programs* at 30 & n.102 (updated Nov. 20, 2018), https://crsreports.congress.gov/product/pdf/R/R43571/11. These numbers could easily exceed the number of borrowers affected by a particular military operation or national emergency, underscoring how the HEA's purportedly "specific" provisions for the forgiveness or cancellation of student loan debt may actually sweep much more broadly than an application of the HEROES Act.

(quoting *Gonzales v. Oregon*, 546 U.S. 243, 267 (2006)). When Justice Scalia used the mousehole metaphor for the first time in the U.S. Reports, he used it to express the idea that Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). There is no mousehole here because there is nothing "vague" or "ancillary" about the HEROES Act. The HEROES Act expressly gives the Secretary sweeping authority to "waive or modify *any* statutory or regulatory provision applicable to the student financial assistance programs under title IV," "[n]otwithstanding *any* other provision of law." 20 U.S.C. § 1098bb(a)(1) (emphases added). It confers that authority to enable the Secretary to act in times of "national emergency," when significant actions with potentially far-reaching consequences are often required. *Id.* And it expressly contemplates that the Secretary may exercise this authority to impose new requirements "in lieu of" those contained in statutes and regulations. *Id.* § 1098bb(b)(2). The HEROES Act, in short, is no "mousehole," and cancellation of student debt fits comfortably within the statute's expansive scope.

## B.

Legislative history and past administrative practice reinforce our reading of the HEROES Act as allowing the Secretary to use his waiver and modification authority to cancel student loan debt.

## 1.

The legislative history of the HEROES Act indicates that Members of Congress understood the breadth of the authority they were providing the Secretary. Some Members emphasized that the Act would provide the authority "to act quickly should a situation arise that has not been considered," 149 Cong. Rec. 7923 (2003) (statement of Rep. McKeon), and the flexibility to "address events now unforeseen," *id.* at 7925 (statement of Rep. Holt). These statements are consistent with the conclusion that, because of the unforeseen circumstances of a national emergency, the Secretary might deem it necessary to cancel or reduce certain amounts of student loan debt.

We have found no statements from the brief floor debate on the Act expressly rejecting the Secretary's power to cancel student loan debt under the HEROES Act. A few statements suggest that some Members of Congress viewed the Act primarily as authorizing the Secretary to defer payments. *See, e.g.*, *id.* at 7923 ("What we want to do here is to make it clear to the Secretary that . . . in the case of a national emergency that he can, in fact, defer these payments." (statement of Rep. Boehner)); *id.* at 7922 ("the Secretary will have the opportunity to forbear a loan as our servicemen and servicewomen are activated" (statement of Rep. Ryan)); *id.* ("the HEROES Act of 2003 . . . gives the Secretary the authority . . . to ensure that our troops whose lives have been disrupted suddenly, and now serve us in the Middle East and in Iraq, to make sure that . . . their loan payments are deferred until they return" (statement of Rep. Isakson)). But these statements do not demonstrate that these Members viewed the HEROES Act as *preventing* debt cancellation as an exercise of the Secretary's discretion to accomplish the objectives of the Act. An alternative explanation is that they simply did not focus on this particular application when they enacted the statute. There is nothing in these or any other statements in the legislative history indicating that Congress meant to prevent the Secretary from reducing or canceling debt if the Secretary "deems" such reductions or cancellations "necessary" to "ensure" that "affected individuals are not placed in a worse position financially in relation to [their] financial assistance because of their status as affected individuals."

## 2.

We also find nothing in past administrative practice that would undermine our interpretation. As noted above, *see supra* Part I.C, the Secretary has invoked the authority under section 1098bb(a)(1) a number of times since the statute's enactment in 2003. One of these invocations, the expansion of eligibility for borrower defenses to repayment, will almost certainly reduce the amount of principal repaid by borrowers. *See* 34 C.F.R. § 685.222(i)(1) ("appropriate . . . relief" for a borrower who establishes a defense "may be a discharge of *all* amounts owed to the Secretary on the loan at issue" (emphasis added)). Other invocations—such as suspending interest accrual and repayment obligations in response to the

COVID-19 pandemic, *see* 85 Fed. Reg. at 79,862—entailed the waiver or modification of significant elements of the student loan program.

We can identify no good reason why section 1098bb(a)(1) would allow the Secretary to waive or modify these important provisions of the student loan program, but would deny the Secretary the authority to waive or modify the obligation to repay the principal balance of student loans. In each case, the provisions being waived or modified are significant and the economic consequences of those changes are potentially substantial. Yet neither the Secretary nor Congress indicated that these prior exercises of authority were of questionable validity or marked the outer reaches of the Secretary's authority. To the contrary, Congress took steps to ensure that the Secretary would continue to carry them out. *See* CARES Act § 3513(a), (b), 134 Stat. at 404 (directing the suspension of loan payments and a freeze on the accrual of interest through September 30, 2020, following the Secretary's invocation of the HEROES Act to suspend loan payments and to set interest rates to zero). Even if the direct cancellation of the principal balances of student loans would be a new application of the statute, novelty alone would not itself be a reason to conclude that an agency's exercise of statutory authority is unlawful, *see Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1750 (2020)—particularly in the context of a relatively young statute like the HEROES Act that was expressly designed to respond to unforeseen emergencies.

**3.**

Finally, the Rubinstein Memorandum raises the specter of constitutional concerns that we find clearly have no appropriate application here—and that in particular do not warrant reading unwritten limits into the clear text of section 1098bb(a)(1). First, we have no concern that our interpretation might create a violation of the Appropriations Clause. *See* Rubinstein Memorandum at 1–2, 4. The Appropriations Clause provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Here, the waiver or cancellation of student debt does not require drawing money from the Treasury; it entails a waiver of the right to collect money that is owed to the United States. The Appropriations Clause therefore is not implicated. Second, the cancellation of student loan debt in no way involves an impermissible exercise of settlement authority that amounts to a dispensing

power. *See* Rubinstein Memorandum at 6–7. To the contrary, the Act's clear text authorizes waiver or modification, and this authority extends to waiver and modification of the obligation to repay student loan balances. As a result, cancellation of student loan debt that conforms to the requirements of the HEROES Act, *see infra* Part III, represents an implementation of the Act and not a suspension of governing law.

## III.

We thus conclude that the HEROES Act authorizes the Secretary to waive or modify statutory or regulatory provisions in a way that results in the reduction or cancellation of student debt. This leaves the question of whether the reduction and cancellation of the principal balances of student loans as a response to the COVID-19 pandemic, on a categorical basis, comports with the remaining requirements of the Act. The Act authorizes waiver or modification—and thus debt cancellation or reduction—"as the Secretary deems necessary in connection with a . . . national emergency . . . as may be necessary to ensure that . . . recipients of student financial assistance . . . who are affected individuals are not placed in a worse position financially in relation to that financial assistance because of their status as affected individuals." 20 U.S.C. § 1098bb(a). This text imposes a number of requirements: (1) the beneficiary of the cancellation must be an "affected individual"; (2) the harm sought to be avoided must arise "because of" the beneficiary's status as such an individual; and (3) the Secretary must deem the cancellation "necessary" to "ensure" the beneficiary is not placed in a "worse position financially in relation to [the individual's] financial assistance." After considering these requirements, we conclude that invocation of the HEROES Act to provide debt reduction or cancellation on a class-wide basis to individuals affected by the COVID-19 national emergency could be structured as a permissible invocation of the Act.

## A.

The HEROES Act first requires that any beneficiary of a waiver or modification be an "affected individual." As noted earlier, the Act defines an affected individual to include any "individual who . . . resides or is employed in an area that is declared a disaster area by any Federal, State,

or local official in connection with a national emergency" and any individual who "suffered direct economic hardship as a direct result of a . . . national emergency, as determined by the Secretary." *Id.* § 1098ee(2)(C), (D).

In March of 2020, the President declared the COVID-19 pandemic a "national emergency." *See* Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2020); *see also* 20 U.S.C. § 1098ee(4) ("The term 'national emergency' means a national emergency declared by the President of the United States."). And the federal government has declared every state, the District of Columbia, and all five permanently populated U.S. territories to be disaster areas because COVID-19 has spread or is at risk of spreading there. *See* Federal Emergency Management Agency, COVID-19 *Disaster Declarations* (last updated Aug. 20, 2021), https://www.fema. gov/disasters/coronavirus/disaster-declarations. As a result, any person who resided or worked in the United States or its territories during the pandemic could benefit from waivers or modifications issued under the Act as part of the Secretary's response to COVID-19, as could any person the Secretary determines suffered direct economic hardship as a direct result of the pandemic.

## B.

The HEROES Act further requires that the waiver or modification "may be necessary to ensure that . . . affected individuals are not placed in a worse position financially in relation to [the individuals'] financial assistance *because of* their status as affected individuals." 20 U.S.C. § 1098bb(a)(2)(A) (emphasis added). Hence, waivers or modifications of the student loan terms for individuals who resided or worked in the United States or its territories during the pandemic would be permissible only as may be necessary to ensure the individuals are not placed in a "worse position financially . . . *because of*" the COVID-19 pandemic. *Id.* (emphasis added).

The term "because of" typically carries a requirement of but-for causation. *See, e.g.*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (construing the term "because of" in the Age Discrimination in Employment Act to mean that "a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision"); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (construing a statute that "makes it

unlawful for an employer to take adverse employment action against an employee 'because' of certain criteria" to "require proof that the desire to retaliate was the but-for cause of the challenged employment action"); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1016 (2020) (the phrase "because of" is "often associated with but-for causation"). In the absence of any statutory indication to the contrary, we believe that the term "because of" in the HEROES Act carries with it the usual requirement of but-for causation. Thus, to invoke the HEROES Act in the context of COVID-19, the Secretary would need to determine that the COVID-19 pandemic was a but-for cause of the financial harm to be addressed by the waiver or modification.

## C.

Finally, the HEROES Act authorizes waivers and modifications "as may be necessary" to "ensure" that recipients of financial assistance, because of their status as affected individuals, "are not placed in a worse position financially in relation to that financial assistance." 20 U.S.C. § 1098bb(a)(2)(A). This provision provides additional direction for the Secretary's exercise of this authority in two respects: First, waivers or modifications under the Act should be structured to put loan recipients back into the financial position they would be in were it not for the national emergency—that is, to offset the borrower's harm by providing the relief that may be necessary to ensure the borrower is no "worse" off because of the emergency. Second, no matter how much financial harm a borrower may have suffered because of a national emergency, the Secretary can use the HEROES Act only to offset that portion of the harm that has a "relation to" the borrower's title IV assistance.

## D.

Within these parameters, we believe the HEROES Act authorizes the Secretary to determine that cancellation of student debt is warranted under the waiver and modification authority as a response to the COVID-19 pandemic. We also believe that affording this relief on a broad, categorical basis could be an appropriate invocation of the Act. We reach these conclusions for several reasons.

First, section 1098bb(a)(1) provides that the Secretary may waive or modify provisions "*as the Secretary deems necessary* . . . to provide the waivers or modifications authorized by paragraph (2)." 20 U.S.C. § 1098bb(a)(1) (emphasis added). Courts have time and again recognized that statutes using "the word 'deem' . . . give [an agency] discretion to determine" whether statutory requirements are met. *See, e.g.*, *Mehanna v. U.S. Citizenship & Immigr. Servs.*, 677 F.3d 312, 315 (6th Cir. 2012) (quotation marks omitted); *Ghanem v. Upchurch*, 481 F.3d 222, 225 (5th Cir. 2007) ("We interpret the phrase 'for what he deems' as vesting complete discretion in the Secretary[.]"). Indeed, the Supreme Court has found that a textually similar grant of power—to take actions an official "deem[ed] . . . necessary or advisable"—conferred authority that was "committed to agency discretion by law" and so was beyond the scope of judicial review. *Webster v. Doe*, 486 U.S. 592, 600 (1988) (emphasis and quotation marks omitted).

Second, the statute reinforces this grant of discretion by authorizing the Secretary to waive or modify provisions "as *may be* necessary." 20 U.S.C. § 1098bb(a)(2) (emphasis added). In the context of a statute conferring authority on an officer, this phrase, too, is regularly construed as a grant of "legitimate discretionary power." *See, e.g.*, *City of New York v. FCC*, 486 U.S. 57, 67 (1988) (holding that the phrase "may be necessary" confers "legitimate discretionary power" on the agency); *Holy Cross Hosp.-Mission Hills v. Heckler*, 749 F.2d 1340, 1343 (9th Cir. 1984) (statute authorizing an agency to "prescribe such regulations as may be necessary to carry out the administration" of a statutory program "grant[ed] . . . broad discretionary power" (quotation marks omitted)).

Third, we do not believe the statute's use of the word "necessary," 20 U.S.C. § 1098bb(a), significantly curtails the scope of the Act. The term "necessary" may bear a range of meanings. "In the strictest sense of the term, something is 'necessary' only if it is essential." *Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018). But necessary can also mean simply that something is "reasonably and logically" related to achieving a certain end, *see FTC v. Rockefeller*, 591 F.2d 182, 188 (2d Cir. 1979), or even "helpful and appropriate," *see Davis*, 138 S. Ct. at 1093; *accord, e.g.*, *United States v. Comstock*, 560 U.S. 126, 133–34 (2010) (observing that the Necessary and Proper Clause allows for laws that are "'convenient, or useful'" or "'conducive'" to the exercise of enumerated powers (quoting

*M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413, 418 (1819))); *Cellco P'ship v. FCC*, 357 F.3d 88, 97 (D.C. Cir. 2004) ("courts have long recognized that the term 'necessary' does not always mean 'indispensable' or 'essential'").

Here, several contextual clues indicate that Congress used the word "necessary" in a more flexible and capacious sense, as meaning "appropriate" or "conducive" rather than "essential." As an initial matter, the fact that Congress granted the Secretary discretion to "deem" whether a waiver or modification "may be" necessary signals that Congress understood the word to authorize a range of possible actions, not merely the narrowest possible course. And the Act's empowering of the Secretary to use the waiver and modification authority "to ensure that" the Act's statutory objectives are achieved, 20 U.S.C. § 1098bb(a)(2), further signals that Congress intended to give the Secretary leeway. The use of the term "ensure" conveys the understanding that Congress was concerned with "making certain" that the objectives listed in section 1098bb(a)(2) are achieved, rather than with limiting the Secretary to only those waivers and modifications that are strictly essential. *See Ensure*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/ensure (last visited Aug. 21, 2022) (defining "ensure" as meaning "to make . . . certain").

That Congress did not expect a closely tailored fit between the Secretary's exercise of the waiver-and-modification authority and the Act's objectives is also evident from the Act's instructions on the manner in which the Secretary can exercise the waiver or modification authority. The Act states that the Secretary need not exercise the waiver or modification authority "on a case-by-case basis," 20 U.S.C. § 1098bb(b)(3), thereby authorizing the Secretary to proceed by categorical rules, even though categorical rules by their nature entail a degree of imprecision. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39 (2011) (noting that any "bright-line rule . . . must necessarily be overinclusive or underinclusive" (quotation marks omitted)). In like vein, section 1098bb(a)(2)(B) authorizes the Secretary to minimize "administrative requirements placed on affected individuals," provided "the integrity of the student financial assistance programs" is not "impair[ed]." Thus, in the context of relief for borrowers affected by COVID-19, the Secretary might conclude that relief should be afforded through an individualized application process in

which borrowers could demonstrate that they suffered financial harm from the pandemic; but the Secretary could also conclude that such burdensome procedures would not achieve the goal of minimizing the administrative requirements placed on affected individuals, and that waivers and modifications should instead be issued on an administratively convenient categorical basis.

Fourth, past administrative practice is also consistent with the view that the Secretary has flexibility in determining how best to achieve the purposes of the Act. The Secretary has repeatedly interpreted the statutory term "necessary" as equivalent to "appropriate," rather than "essential." *See* 68 Fed. Reg. at 69,312–13 (adopting waivers and modifications "that the Secretary believes are *appropriate* to ensure" certain objectives (emphasis added)); 77 Fed. Reg. at 59,312 (same). And every invocation of the HEROES Act to date has included expansive relief that was to some degree overinclusive of the statute's purposes. For instance, as discussed above in Part I.C, the Secretary's 2003 rulemaking waived a series of administrative requirements for *every* affected individual, even though the rationales for many of those waivers applied to only a subset of affected individuals. The Secretary's 2012 rulemaking extended those broad waiver provisions and added a new one. And, most notably, the Secretary's 2020 actions suspended the obligation to pay student debt for every student loan held by the United States, even though such relief undoubtedly was not necessary to avoid financial harm for some of the suspension's beneficiaries. These applications of the Act—two of which were implicitly approved by Congress—plainly reflect an understanding that the statute affords flexibility for the Secretary to enact prophylactic waivers and modifications that extend beyond the particular hardship they aim to prevent.

## IV.

For the reasons set forth above, we conclude that the Secretary can exercise the waiver or modification authority granted by the HEROES Act of 2003 to reduce or cancel the principal balances of student loans, provided the Secretary deems the reduction or cancellation necessary to ensure that affected individuals are not placed in a worse position financially in relation to their financial assistance because of their status as affected individuals. We further conclude that reducing or canceling the

principal balances of student loans, including for a broad class of borrowers who the Secretary determines suffered financial harm because of COVID-19, could be a permissible response to the COVID-19 pandemic.

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*